**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NEW ENGLAND ANTI-VIVISECTION SOCIETY, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 16-cv-149 (KBJ) |
| UNITED STATES FISH AND WILDLIFE SERVICE, *et al.*, | ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| YERKES NATIONAL PRIMATE RESEARCH CENTER, | ) ) ) ) | |
| Intervenor-Defendant. | ) ) | |

**MEMORANDUM OPINION**

The question of who can speak for the animals has long vexed federal judges in animal-welfare cases. As a general matter, courts have concluded that well-established principles of Article III standing permit "human beings [to] invoke their own injuries in fact to challenge harms done to animals[,]" Cass R. Sunstein, *Standing For Animals (With Notes On Animal Rights)*, 47 UCLA L. Rev. 1333, 1343 (2000), but it can be "exceptionally confusing" to apply settled standing doctrine to determine when and under what circumstances an act that is allegedly harmful to animals works a cognizable injury in fact to human plaintiffs, *id.* at 1334. In the instant case, a consortium of

organizations and individuals led by the New England Anti-Vivisection Society ("NEAVS"), a non-profit organization that dedicates itself to animal-welfare issues, has claimed the right to file a lawsuit against the United States Fish and Wildlife Service ("FWS") and its Director Daniel Ashe (collectively, "Defendants") to seek to enjoin the agency's grant of a certain wildlife export permit.

Specifically, Plaintiffs object to FWS's decision to permit Intervenor-Defendant Yerkes National Primate Research Center ("Yerkes") to transfer eight of its chimpanzees to a zoo in the United Kingdom; the agency has authorized this act of exportation pursuant to Section 10 of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, on the condition that Yerkes commit to donating money to an unrelated non-governmental organization that purportedly will use the funds for a chimpanzee conservation program.  Plaintiffs complain, *inter alia*, that the agency's decision to issue an export permit under these circumstances violates certain fundamental tenets of the ESA, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and the Convention on International Trade in Endangered Species ("CITES"), 27 U.S.T. 1087 (Mar. 3, 1973).  (*See* Am. Compl. ("Compl."), ECF No. 6, ¶¶ 145–161.))  Among Plaintiffs' myriad objections to this particular permit arrangement is their contention that the plain language of the ESA prohibits FWS from establishing this sort of 'pay-to-play' export permitting scheme, which, Plaintiffs say, at best inures to the benefit of endangered species only indirectly.  (*See id*. ¶ 4 (asserting that Section 10 of the ESA "requires that the permitted activity *itself* 'enhance the survival' of the chimpanzee species" (emphasis in original)).)  Plaintiffs also contend, *inter alia*, that FWS

purportedly failed "to consider the adverse impacts of its decision on efforts to conserve chimpanzees in the wild," and "to consider the precedential effect its decision will have on the disposition of other captive chimpanzees[.]"  (*Id.* ¶ 5.)

Before this Court at present are three partial cross-motions for summary judgment that Plaintiffs, FWS, and Yerkes have now filed.  (*See* Pls.' Mot. for Partial Summ. J. ("Pls.' Mot."), ECF No. 39; Defs.' Mot. for Partial Summ. J. ("Defs.' Mot."), ECF No. 44; Def.-Intervenor's Cross-Mot. for Summ. J. ("Yerkes's Mot."), ECF No. 42).[1]  Plaintiffs focus primarily on the alleged harm to the chimpanzees at issue (Plaintiffs believe they would be far better off if they were sent to a sanctuary within the United States rather than "an unaccredited zoo" overseas (Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), ECF No. 39-1, at 9)), and they suggest that FWS's export-permit decision not only violates the ESA but also injures endangered species as a whole because, in Plaintiffs' view, it was "Congress's stated intention to *limit* substantially the number of exemptions that may be granted" under Section 10 of the ESA, and that intent is "completely eviscerated by allowing applicants to simply buy Section 10 permits by promising to contribute money to someone else" (*id.* at 32 (emphasis altered) (citation omitted)).[2]  Plaintiffs also argue that the permit hurts NEAVS in various ways, including "mak[ing] it impossible for NEAVS to advocate for the release of these . . . chimpanzees to a U.S. sanctuary" (*id.* at 49–50 (citation omitted)), and that three of the individual plaintiffs—all of whom are former Yerkes

---

[1] These motions are for "partial" summary judgment because they do not address a count of the complaint that has been brought under the Freedom of Information Act, 5 U.S.C. § 552 *et seq.*  (*See* Compl. ¶162.)

[2] Page-number citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

employees who allegedly have formed "strong emotional bonds with these animals" (*id.* at 50 (citations omitted))—will suffer too if these chimpanzees are exported to England. For their part, FWS and Yerkes defend the agency's decision to issue the export permit on the merits, asserting that Section 10(a) is a "broad grant of discretion" that "allows for and does not preclude enhancement [of the species] by indirect means."  (Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), ECF No. 44-1, at 30–31; *see also* Yerkes's Mot. at 23–35.)  Defendants also maintain that this Court lacks subject-matter jurisdiction over the instant action as a threshold matter, because, in their view, none of the plaintiffs have Article III standing to seek a court order setting aside the permit. (Defs.' Mem. at 20–30.)

For the reasons explained fully below, this Court finds that Defendants have the better of the standing dispute.  Despite the fact that Plaintiffs have presented a series of persuasive arguments regarding the meaning of the ESA and the extent to which FWS's interpretation undermines the goals and purposes of that statute, recent D.C. Circuit case law compels this Court to conclude that Article III requires something more than a potentially meritorious challenge to imprudent government action involving endangered animals: Plaintiffs *themselves* must have a concrete and particularized injury in fact that is actual or imminent, that is fairly traceable to Defendants' actions, and that a federal court's decision can redress.  This Court concludes that Plaintiffs have not satisfied these threshold requirements under binding law regarding Article III standing in animal-welfare and environmental-law cases, and therefore, the Court is constrained to refrain from passing on the merits of Plaintiffs' arguments or granting them the relief they seek.  *See Scenic Am., Inc. v. U.S. Dep't of Transp.*, No. 14-5195, 2016 WL

4608153, at *3 (D.C. Cir. Sept. 6, 2016) ("Observing our Article III limitations is . . . always important, and particularly so in a case such as this, where we are asked to invalidate an action of the Executive branch.").  Consequently, Defendants' and Yerkes's partial motions for summary judgment must be **GRANTED**, Plaintiffs' partial motion for summary judgment must be **DENIED**, and the claims at issue herein must be dismissed.  A separate order consistent with this Memorandum Opinion shall issue.

## I.   BACKGROUND

### A.   The Listing Of Chimpanzees As Endangered Species Under The ESA

The ESA has been called "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Babbitt v. Sweet Home Chapter of Cmtys. For a Great Or.*, 515 U.S. 687, 698 (1995) (internal quotation marks and citation omitted).  The statute aims to conserve the populations and habitats of certain species, *see* 16 U.S.C. § 1531(b), and it accomplishes this by, among other things, authorizing the Department of the Interior to determine if a species is "endangered[,]" because it is "in danger of extinction throughout all or a significant portion of its range[,]" *id.* § 1532(6), or is "threatened[,]" insofar as it is "likely to become an endangered species within the foreseeable future[,]" *id.* § 1532(20).  *See also id.* § 1533(a).  "The Department of the Interior administers the ESA for non-marine species and has delegated to the Fish and Wildlife Service (an agency within the Interior Department) the authority to list such species as 'endangered' or 'threatened' through rulemaking."  *Otay Mesa Prop., L.P. v. U.S. Dep't of the Interior*, 144 F. Supp. 3d 35, 40 (D.D.C. 2015) (citing, *inter alia*, 50 C.F.R. § 402.01 (2015)).

FWS has listed chimpanzees as a protected animal species for ESA purposes since 1976. *See* Determination of 26 Species of Primates as Endangered or Threatened Species, 41 Fed. Reg. 45990, 45990 (Oct. 19, 1976); Endangered and Threatened Wildlife and Plants; Listing All Chimpanzees as Endangered Species ("Chimpanzee Final Rule"), 80 Fed. Reg. 34500, 34500 (June 16, 2015). Beginning in 1990, the agency "[s]plit-[l]ist[ed]" chimpanzees (Pls.' Mem. at 13) based upon whether the animals at issue were wild or captive; wild chimpanzees were considered endangered, and captive chimpanzees were deemed threatened. *See* Chimpanzee Final Rule, 80 Fed. Reg. at 34500. Under the ESA, these different designations resulted in the application of different constraints on public and private actions that might impact the species. *Compare* 16 U.S.C. § 1538(a)(1) (banning a host of activities only with respect to endangered species), *with id.* § 1533(d) (authorizing—but not requiring—the Executive to apply the protections found in § 1538(a)(1) to "any threatened species" via regulation).

In 2015, after years of intensive lobbying by animal-welfare organizations, FWS eliminated the dichotomy between wild and captive chimpanzees, deeming all chimpanzees "endangered" within the meaning of the ESA. (Pls.' Mem. at 13–14; Defs.' Mem. at 13); *see also* Chimpanzee Final Rule, 80 Fed. Reg. at 34500. For present purposes, this designation was particularly consequential because Section 9 of the ESA categorically prohibits the export of endangered species, among other things. *See* 16 U.S.C. § 1538(a)(1)(A) (providing that, "with respect to any endangered species of fish or wildlife" that has been listed as such, "it is unlawful for any person subject to the jurisdiction of the United States" to "export any such species from the United

States").[3]  But this export proscription is also subject to certain specified exceptions: Section 10 (titled "Exceptions") establishes the circumstances under which the Secretary is authorized to permit the activities that Section 9 prohibits.  *See* 16 U.S.C. § 1539.

In pertinent part, the text of Section 10(a)(1) reads, as follows:

**(a)  Permits.**

   (1)  The Secretary may permit, under such terms and conditions as he shall prescribe—
      (A)   any act otherwise prohibited by [Section 9] *for scientific purposes or to enhance the propagation or survival of the affected species*, including but not limited to, acts necessary for the establishment and maintenance of experimental populations[.]

16 U.S.C. § 1539(a)(1)(A) (emphasis added).  Under Section 10(c), the Secretary is required to "publish notice in the Federal Register of each application for an exemption or permit which is made under this section[.]"  *Id.* § 1539(c).  And Section 10(c) mandates both that the Secretary's notice must "invite the submission from interested parties, within thirty days after the date of the notice, of written data, views, or arguments with respect to the application[,]" and also that "[i]nformation received by the Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding."  *Id.*  In addition, pursuant to Section 10(d), FWS may not grant a permit to authorize otherwise-prohibited acts with respect to endangered species unless it publishes in the Federal Register a finding that the "exceptions were applied for in good faith," that they "will not operate to the

---

[3] Applicable regulations also recognize this ban on exports.  *See* 50 C.F.R. § 17.21(b).

disadvantage of [the] endangered species," and that issuing the permit "will be

consistent with the purposes and policy" of the ESA.  *Id.* § 1539(d).

## B.     FWS's Approval Of Yerkes's Export-Permit Application

On June 12, 2015, Yerkes—a research laboratory associated with Emory

University (Yerkes's Mot. at 36)—requested that FWS grant it permission under CITES

to export eight chimpanzees that Yerkes owns to the Wingham Wildlife Park

("Wingham") in England.  (*See* CITES Permit Application, AR 000012.)[4]  Yerkes's

staff had purportedly "spent significant time" in 2013 and 2014 "conducting an

extensive due diligence review of Wingham's facility, staff, mission, and plans,"

including site visits (*id.* at 15 (citation omitted)), and in December of 2014, Yerkes

"signed an agreement to donate to Wingham eight chimpanzees, all of which were bred

and born at [Yerkes's] facilities" (*id.* (citation omitted)).[5]  When FWS decided (in June

of 2015) to list captive chimpanzees as an endangered species, Yerkes was forced to

have to seek an exemption from Section 9's export prohibition in order to execute the

Wingham agreement.  (*See id.* at 17 (explaining that Yerkes amended its CITES permit

request "to include a request for a permit under the ESA following the 'uplisting' of

captive chimpanzees to endangered status" (citation omitted))).

---

[4] The voluminous Administrative Record has not been filed on the ECF docket; as explained in their Notice of Filing, Defendants have filed the certified Administrative Record index on the docket and have supplied the full panoply of documents via a USB flash drive delivered to the Court.  (*See* Notice of Filing of Supplemented Admin. R. Index, ECF No. 52, at 1.)

[5] According to Yerkes, Wingham is "home to 200 species and more than 650 animals," and is "a licensed zoo" that "is required to meet the Standards of Modern Zoo Practice[.]"  (Yerkes's Mot. at 14 (footnote omitted).)  Plaintiffs counter that "Wingham is not accredited by either the European Association of Zoos and Aquaria . . . or the British & Irish Association of Zoos and Aquariums[.]"  (Pls.' Mem. at 14–15.)  Plaintiffs also assert that Wingham "has never housed, cared for, or displayed chimpanzees[.]"  (*Id.* at 15).  This dispute of fact regarding Wingham's standards and capabilities need not be resolved because, regardless, alleged harm to an animal, in and of itself, is not a sufficient injury to support a legal action in federal court.  *See ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 336–37 (D.C. Cir. 2003).

After Yerkes finished supplementing its application to include the ESA permit request, FWS published the required Section 10(c) notice.  *See* Endangered Species; Wild Bird Conservation; Marine Mammals; Receipt of Applications for Permit ("Original 10(c) Notice"), 80 Fed. Reg. 62089, 62091 (Oct. 15, 2015).  According to documents in the record, Yerkes originally hoped to satisfy Section 10(a) by making financial commitments to two organizations that conduct "programs that focus on benefits to wild populations of chimpanzees."  (Supplement to Yerkes Permit Request, AR 000257.)  One of those organizations apparently opposed Yerkes's attempted export and rejected its donation once that organization discovered the full import of the action (*see* Letter from Kibale Chimpanzee Project to Wingham, AR 000355–57); the record is less pellucid with respect to the second, but it appears that organization also "withdrew its interest in receiving the donation."  (Decl. of R. Paul Johnson ("Johnson Decl."), Ex. C. to Yerkes's Mot., ECF No. 42-9, ¶ 20.)  Many other conservation groups and conservationists—including Plaintiffs—also objected.  (*See* Pls.' Mem. at 16–20.)

Then, on November 27, 2015, FWS informed NEAVS that (1) "there ha[d] been a shift in the organization and amount" of Yerkes's donation—Yerkes would now donate "$45,000 per year for five years to the Population & Sustainability Network [("PSN"),]" and (2) the export permit would be granted to Yerkes within ten days.  (FWS Email to NEAVS, AR 001359–60.)  Three days later, Plaintiffs filed a lawsuit against FWS that challenged the permitting decision (*see* Pls.' Mem. at 22), and raised essentially the same claims that are before this Court at present, *see* Compl. ¶¶ 84–95, *New England Anti-Vivisection Soc'y v. Jewell*, No. 15-cv-2067 (D.D.C. filed Nov. 30, 2015), ECF No. 1.  Because the recipient shift occurred after the relevant comment

period had closed, *see* Original 10(c) Notice, 80 Fed. Reg. at 62089, FWS elected to reopen the comment period "to allow the public the opportunity to review additional information submitted for the issuance of [the] permit[,]" Endangered Species; Receipt of Application for Permit, 81 Fed. Reg. 3452, 3452 (Jan. 21, 2016), and, as a result, Plaintiffs dismissed that other case (*see* Compl. ¶ 96). The new comment period subsequently closed, and FWS again decided (over strenuous objection from Plaintiffs and others (*see* Pls.' Mem. at 22–28) to grant the permit (*see* Issued Permit, AR 049927–35).

FWS made a number of findings in connection with its decision to issue the export permit to Yerkes. (*See, e.g.*, Enhancement Finding, AR 049912–14; NEPA Statement, AR 049915–18; Section 10(d) Finding, AR 049919–20.) The agency explained, for example, that it viewed Yerkes's application as "an application . . . for the exportation of [the chimpanzees] for the purpose of enhancing the survival of the species in the wild." (Enhancement Finding, AR 049912.) Moreover, and significantly for present purposes, FWS specifically found that "this action [would] enhance the survival of the species" (*id.* AR 049914) *not* because the permitted action itself (i.e., sending these chimpanzees to Wingham) would accomplish this result, but because of the donation to PSN, which is a United Kingdom-based English non-governmental organization that "works at the intersection of sustainability, human health, and population dynamics to conserve biodiversity around the world" (*id.* AR 049912; *see also* Section 10(d) Finding, AR 049920 ("[FWS] determined that the export of the chimpanzees would enhance the propagation or survival of the species.")). FWS explained that PSN had promised to use the funds to "initiat[e] a new . . . program

specifically focused on how [the above-described] factors can be addressed to ameliorate current risks, such as habitat destruction and disease, which face wild chimpanzees in East Africa."  (Enhancement Finding, AR 049912.)  FWS also proceeded to find that the export-permit process complied with Section 10(d)'s requirement that the permit was applied for in good faith and would not "operate to the disadvantage of chimpanzees within [their] natural range."  (Section 10(d) Finding, AR 049920.)

The agency published notice of the Section 10(d) finding in the Federal Register on May 5, 2016.  *See* Endangered Species; Marine Mammals; Emergency Exemption; Issuance of Permits, 81 Fed. Reg. 27170, 27170 (May 5, 2016).

### C.    Procedural History

Meanwhile, on January 29, 2016—during the pendency of the second comment period related to Yerkes's permit application—NEAVS filed a single-issue complaint in this Court, alleging that FWS had violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, because it "ha[d] failed in a timely ma[nn]er to release all of the information to which NEAVS [was] entitled" pursuant to two FOIA requests the organization had made in late 2015.  (Compl. ("Original Compl."), ECF No. 1, ¶¶ 1, 34.)  After the second comment period closed and FWS made its final decision to grant Yerkes's export-permit application, NEAVS amended its complaint to add five other animal-rights organizations, four individuals, and "Georgia," one of the affected chimpanzees.  (*See generally* Compl.).[6]

---

[6] The entire group of plaintiffs consists of NEAVS, Fauna Foundation, Primate Rescue Center, Chimps, Inc., Jungle Friends Primate Sanctuary, Cruelty Free International, Jennifer Feuerstein, Brian A. Hare, Rachel Weiss, Mary Lee Jensvold, and Georgia the chimpanzee.  (*See generally* Compl.)

The amended complaint also attacked the agency's permitting decision on several additional grounds.  (*See id.* ¶¶ 145–61.)  In brief, Plaintiffs claimed that (1) FWS's actions were not in accordance with the ESA and its implementing regulations, and thus violated the APA (*see id.* ¶¶ 145–53 (Count I)); (2) FWS had transgressed Article III of CITES (*see id.* ¶¶ 154–55 (Count II))[7]; (3) FWS had failed to comply with certain NEPA assessment-related requirements (*see id.* ¶¶ 156–57 (Count III))[8]; and (4) FWS's permitting officer and other agency officials had acted in various inappropriate ways that amounted to arbitrary and capricious decisionmaking in violation of the APA's bedrock principles (*see id.* ¶¶ 158–61 (Count IV)).  The amended complaint also persisted with the aforementioned FOIA claim.  (*See id.* ¶ 162 (Count V).)

---

[7] CITES "is a multilateral treaty that regulates the international trade of protected wildlife[.]"  *Friends of Animals v. Ashe*, No. 15-0653, 2016 WL 1170937, at *1 (D.D.C. Mar. 24, 2016); *see also Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076, 1078–79 (D.C. Cir. 2004).  Article III of that treaty provides, among other things, that export permits may only be granted when the "Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species" and the "Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health[,] or cruel treatment" and that an "import permit has been granted for the specimen."  CITES, art. III, ¶ 2(a), (c)–(d).  Subdivisions of FWS serve as this country's Scientific and Management Authorities.  *See Marcum v. Salazar*, 694 F.3d 123, 125 (D.C. Cir. 2012).

[8] The NEPA is "a 'procedural statute' that is designed to ensure that federal agencies make fully informed and well-considered decisions."  *Otay Mesa*, 144 F. Supp. 3d at 43 (internal quotation marks and citation omitted).  The statute requires agencies "'to the fullest extent possible' to prepare an environmental impact statement ('EIS') in 'every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment[.]"  *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 32 (D.D.C. 2013) (alteration in original) (quoting 42 U.S.C. § 4332(C)).  No EIS is required if the agency conducts "a shorter environmental assessment (EA)" and finds "that the proposed action will not have a significant impact on the environment[.]"  *Id.* (internal quotation marks and citation omitted).  But if a "categorical exclusion" applies—a term that describes "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of [applicable] regulations[,]" 40 C.F.R. § 1508.4—an agency need perform neither an EIS nor an EA, *see Safari Club*, 960 F. Supp. 2d at 32.  With respect to the Yerkes permit, FWS also found that, under the NEPA, a categorical exclusion applied to its permit grant, and no extraordinary circumstances, *see* 40 C.F.R. § 1508.4; 43 C.F.R. § 46.215, that would bar such an exclusion were present.  (*See* NEPA Statement, AR 049915–18.)

On April 27, 2016, Yerkes requested permission from this Court to intervene in this lawsuit as a defendant (*see* Consent Mot. to Intervene, ECF No. 9); the Court granted Yerkes's request on April 29, 2016 (*see* Mem. Op. & Order, ECF No. 15). Thereafter, Plaintiffs filed a motion for a preliminary injunction that sought to enjoin execution of the permitted activity pending final resolution of the case.  (*See* Pls.' Mot. for Preliminary Injunction ("P.I."), ECF No. 18, at 1.)  This Court held a hearing on Plaintiffs' P.I. motion on May 24, 2016 (*see* Order, ECF No. 27), after which the Court denied the motion as moot in light of Yerkes's agreement to suspend its transfer of the chimpanzees voluntarily in order to permit the matter to be briefed as cross-motions for summary judgment and decided with the benefit of a full administrative record (*see id.* at 1).

Plaintiffs filed their cross-motion for summary judgment on July 8, 2016.  In their memorandum in support of the motion, Plaintiffs home in on a subset of the claims in their wide-ranging complaint.  For example, Plaintiffs specifically argue that Section 10 of the ESA does not authorize FWS's permitting decision, insofar as that section requires (and FWS failed to find) that the permitted act *itself* enhance the propagation or survival of the species.  (*See* Pls.' Mem. at 29–33.)  Additionally, Plaintiffs assert that, even if the ESA permits FWS's interpretation, FWS unlawfully delegated its duty to make the enhancement finding to a third party (*see id.* at 33–36); that the grant of the permit somehow violates the consultation requirement in Section 7(a) of the ESA (*see*

*id.* at 45 n.34)[9]; and that FWS failed to comply with the APA's mandate regarding reasoned decisionmaking because the agency improperly disregarded certain public comments (*see id.* at 36–38). Plaintiffs also contend that the NEPA's requirement that the agency conduct an environmental impact assessment and produce the corresponding statement applied to the permit determination, because the categorical exclusion is inapplicable, either on its own terms or because extraordinary circumstances apply. (*Id.* at 38–45.)[10]

Defendants' cross-motion for summary judgment, which was filed August 4, 2016, not only challenges Plaintiffs' claims on the merits, it also contends that this Court lacks subject-matter jurisdiction because Plaintiffs lack Article III standing to maintain this lawsuit. (*See generally* Defs.' Mem.) In this regard, Defendants assert that the informational, organizational, and aesthetic injuries upon which Plaintiffs rely for standing (discussed at length in Part III) do not constitute actual or imminent injuries in fact (*see id.* at 19–30). Yerkes spends most of its cross-motion memorandum attempting to defend the rationality of FWS's conclusion that a sizable monetary donation to an organization that supports (human) family planning and reproductive health services will benefit chimpanzees as a species (*see, e.g.*, Yerkes's Mot. at 24–25,

---

[9] Section 7(a)(2) "provides that a federal agency must consult with agencies the Secretaries of Commerce and the Interior designate in order to 'insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species.'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 664, 649 (2007) (alteration in original) (quoting 16 U.S.C. 1536(a)(2)).

[10] As Defendants point out, Plaintiffs make no summary judgment arguments related to the complaint's contention that Defendants have violated Article III of CITES. (*See* Defs.' Mem. at 50). And given that Plaintiffs also fail to make any such argument in their reply brief, the Court deems this claim abandoned. *See Pub. Emps. for Env'tl Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 129 (D.D.C. 2014); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived.").

36–41), but Yerkes also generally agrees with Defendants that, in any event, Plaintiffs have failed to assert an injury in fact that FWS's action caused and that will likely be remedied if Plaintiffs prevail (*see id.* at 49–54).

## II.   LEGAL STANDARDS

As noted above, Plaintiffs' complaint asks this Court to set aside FWS's decision to issue an export permit to Yerkes on a variety of grounds.  (*See* Compl. ¶¶ 145–161.) The motions at issue here are styled as motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure; however, "in cases involving review of a final agency action[,] . . . the standard set forth in [Rule 56] does not apply because of the limited role of a court in reviewing the administrative record."  *Otsuka Pharm. Co. v. Burwell*, No. 15-1688, 2016 WL 4098740, at *6 (D.D.C. July 28, 2016) (alterations in original) (internal quotation marks and citation omitted).  Rather, the Court "act[s] as an appellate tribunal[.]"  *XP Vehicles, Inc. v. U.S. Dep't of Energy*, 156 F. Supp. 3d 185, 191 (D.D.C. 2016) (first alteration in original) (internal quotation marks and citation omitted).  Thus—assuming the court has jurisdiction to review the claims brought in the case—the court's function is "solely 'to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Otsuka Pharm.*, 2016 WL 4098740, at *6 (quoting *ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76, 79 (D.D.C. 2013)).  That task includes ensuring that the agency action was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).

As always, however, before the court can render a decision on the merits of a plaintiff's challenge to agency action, it must first satisfy itself that it has jurisdiction

over the plaintiff's claims because the plaintiff who seeks the court's assistance meets the "irreducible constitutional minimum of standing[.]" *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (internal quotation marks and citation omitted); *see also Scenic Am.*, 2016 WL 4608153, at *3–4. Standing doctrine "helps preserve the Constitution's separation of powers and demarcates 'the proper—and properly limited—role of the courts in a democratic society[,]'" *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1279 (D.C. Cir. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)), and thus, must not be viewed as a "troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated[,]" *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 476 (1982). Pursuant to our Constitution, the role of the federal courts "is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law[,]" and "[e]xcept when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009) (citation omitted). Accordingly, and as a general matter, the threshold inquiry for any federal court is whether the plaintiff has alleged, and ultimately proven, "such a *personal* stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction." *Id.* at 493 (emphasis added) (internal quotation marks and citation omitted); *cf.* Lin-Manuel Miranda, *The Room Where It Happens*, *on* Hamilton (Atlantic Records 2015) ("[Y]ou don't get a win unless you play in the game.").

The three essential elements of Article III standing are by now well established. The Constitution requires:

> (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett*, 520 U.S. at 167 (citation omitted).   It is axiomatic that the party that invokes federal jurisdiction has the burden of establishing these elements, and as relevant here, it is also clear that, "at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts" that support his claim of injury, causation, and redressability.  *Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 34 (D.D.C. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148–49 (2013) (internal quotation marks omitted)); *see also Bennett*, 520 U.S. at 168 (noting that, at summary judgment, the motion-to-dismiss practice of "presum[ing] that general allegations embrace those specific facts that are necessary to support the claim" no longer applies (internal quotation marks and citation omitted)).

Furthermore, when it evaluates whether or not a plaintiff has Article III standing, the court must not "decide . . . for or against the plaintiff" on the merits of his claims, *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) (internal quotation marks and citation omitted); rather, the court must "*assume* that on the merits the plaintiffs would be successful in their claims." *Id.* (emphasis added) (internal quotation marks and citation omitted); *see also Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007).  And while standing is not entirely precluded if "the plaintiff is not himself the object of the government action or inaction he challenges," there is no question that "it is ordinarily substantially more difficult to establish."  *Fed. Forest Res. Coal.*, 100

F. Supp. 3d at 34 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotation marks omitted)); *see also Food & Water Watch v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015).

## III.   ANALYSIS

This case begins and ends with the Article III standing inquiry.   Plaintiffs insist that they are entitled to bring this challenge to the export permit that FWS has granted to Yerkes because they have suffered (or imminently will suffer) various injuries in fact as a result of this permitting decision.   To support this contention, which is essential to establishing standing and thus this Court's subject-matter jurisdiction, Plaintiffs offer three separate theories of injury: (1) that all of the plaintiffs have suffered an "informational" injury, because FWS failed to collect and provide information about the nature and scope of the PSN project prior to authorizing the export (*see* Pls.' Mem. at 46–48); (2) that NEAVS's organizational interests will be injured (i.e., it has "organizational" standing), because the permit runs contrary to NEAVS's goals and it will spend money in response (*see id.* at 48–50); and (3) that some of the plaintiffs (three of the individuals) have suffered or soon will suffer an "aesthetic" injury based on their personal concern for the particular chimpanzees at issue (*see id.* at 50–53). Unfortunately for Plaintiffs, each of these standing theories founders under existing precedents that bind this Court, and thus, the Court is compelled to conclude that no plaintiff has demonstrated a concrete or particularized injury in fact that is actual or imminent, as explained below.

### A.   Plaintiffs Have Not Demonstrated That They Have A Cognizable Informational Injury

An informational injury can occur when a plaintiff is deprived of information

that a statute entitles him to have.  *See Zivotofsky v. Sec'y of State*, 444 F.3d 614, 618

(D.C. Cir. 2006) ("Any[] [FOIA requester] whose request for specific information has

been denied has standing to bring an action . . . . The requester is injured-in-fact for

standing purposes because he did not get what the statute entitled him to receive."

(some citations omitted) (citing, *inter alia*, *FEC v. Akins*, 524 U.S. 11, 23–25 (1998));

*see also Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 97 (D.D.C. 2000) (explaining

that "[i]nformational standing arises 'only in very specific statutory contexts' where a

statutory provision has 'explicitly created a right to information'" (quoting *Animal*

*Legal Def. Fund, Inc. v. Espy,* 23 F.3d 496, 502 (D.C. Cir. 1994))).  Under such

circumstances, which are "exceedingly limited" as a practical matter, *Food & Water*

*Watch v. Vilsack*, 79 F. Supp. 3d 174, 197 (D.D.C. 2015), *aff'd*, 808 F.3d 905 (D.C. Cir.

2015), an alleged informational injury can provide the necessary injury in fact to

support Article III standing.  The necessary circumstances do not exist in this case.

> 1. <u>Section 10(c) Does Not Require FWS To Collect And Disclose Information Beyond That Which Is Submitted To The Agency In Support Of A Permit Application</u>

As the D.C. Circuit recently explained, "[a] plaintiff suffers sufficiently concrete

and particularized informational injury where the plaintiff alleges that: (1) it has been

deprived of information that, on its interpretation, a statute requires the government or a

third party to disclose to it, and (2) it suffers, by being denied access to that

information, the type of harm Congress sought to prevent by requiring disclosure."

*Friends of Animals v. Jewell ("Friends of Animals II")*, No. 15-5223, 2016 WL

3854010, at *3 (D.C. Cir. July 15, 2016) (citation omitted).  Importantly, it is well

established that "the existence and scope of an injury for informational standing

purposes is defined *by Congress*[.]"  *Id.* at *2 (emphasis added) (citation omitted); *cf.*

*Warth v. Seldin,* 422 U.S. 490, 514 (1975) ("Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute." (citation omitted)).  Consequently, a "plaintiff seeking to demonstrate that it has informational standing generally need not allege any additional harm beyond the one Congress has identified." *Friends of Animals II*, 2016 WL 3854010, at *2 (emphasis omitted) (internal quotation marks and citation omitted); *see also Zivotofsky*, 444 F.3d at 617 (explaining that "[a]nyone whose request for specific information has been denied has standing to bring an action; the requester's circumstances—why he wants the information, what he plans to do with it, what harm he suffered from the failure to disclose—are irrelevant to standing" (citation omitted)).

Here, Plaintiffs assert that they have suffered informational injury "because the FWS's failure to collect the information necessary to conclude that the authorized export will 'enhance the survival' of the chimpanzee species, and its decision to instead allow PSN, Yerkes, and Wingham to make this determination . . . [,] violated the Plaintiffs' right to receive and comment on such information *before* the FWS made the decision at issue, as required by Section 10(c)[.]"  (Pls.' Mem. at 46 (emphasis in original).)  Pursuant to the above-cited cases, Plaintiffs might well have had a viable contention that they were injured by this alleged deprivation of relevant information that the agency failed to collect, but only if Section 10(c) actually *does* require the agency "to collect the information necessary to conclude that the authorized export will 'enhance the survival' of the . . . species" (*id.*), and this Court sees no such affirmative-collection requirement in that statutory provision.  Indeed, the plain text of the

disclosure requirement in Section 10(c) is far more limited; as relevant here, it provides only that "[i]nformation *received* by the Secretary as a part of any application [for a permit] shall be available to the public as a matter of public record at every stage of the proceeding." 16 U.S.C. § 1539(c) (emphasis added). By its terms, then, Section 10(c) "creates a "right to information[,]" *Friends of Animals v. Jewell (Friends of Animals I)*, 824 F.3d 1033, 1041 (D.C. Cir. 2016), but that right extends only to the information that the agency *receives* in connection with a permit application, and Congress did not impose any duty to make an affirmative effort to *collect* certain information as part of the permitting process, which is the failure that Plaintiffs contend has injured them. Consequently, Plaintiffs' alleged informational injury—i.e., that they did not receive information that FWS failed to collect (where the disclosure provision upon which Plaintiffs rely to support this assertion does not require the collection of such information)—is not a cognizable injury for standing purposes.

The D.C. Circuit's recent decision in *Friends of Animals II* makes clear why this is so. That case involved Section 4(b) of the ESA, which authorizes petitions to the Secretary of the Interior to request that a species be added or removed from the endangered or threatened species lists. *See* 16 U.S.C. § 1533(b)(3)(A). Under Section 4(b)(3)(A), once petitioned, the agency has 90 days to decide "whether the petition presents substantial . . . information indicating that the petitioned action may be warranted." *Id.* If so, then, within 12 months of receiving the petition, the agency must make one of three potential findings, each of which, when made, triggers a duty on the agency's part to publish certain finding-specific information in the Federal Register. *See Friends of Animals II*, 2016 WL 3854010, at *1 (citing 16 U.S.C. § 1533(b)(3)(B));

*see also id.* at *3 (explaining that Congress adopted a "sequential procedural structure" insofar as "[t]he disclosure requirement sets forth what information the [agency] must publish *after* making a given finding" (emphasis in original)).  The *Friends of Animals II* plaintiff was a nonprofit organization that contended the agency had blown through the 12-month deadline for making findings, *see id.* at *2, *4, and claimed informational standing to enforce the findings requirement on the grounds that, insofar as meeting the deadline for making findings triggered a disclosure requirement, the Secretary's failure to meet the deadline deprived them of the information to which they would be entitled, *see id.* at *3–4.

The D.C. Circuit rejected this informational standing contention.  Stated simply, the Circuit focused on "the first part of the [informational standing] inquiry"—i.e., the requirement that the plaintiff be deprived of information that the statute requires produced—and, based on its evaluation of the statutory provisions at issue, concluded that "[t]he disclosure requirement [plaintiff] points to as the source of its informational injury does not impose any obligations on the [agency] until a later time in the listing process." *Id.* at *3.  Under the Circuit's reading, "[t]he structure of section 4(b)(3)(B) makes clear that [the deadline and disclosure] requirements arise sequentially[,]" *id.*, and thus, "Congress placed the Secretary under no obligation to publish any information in the Federal Register until after making a 12-month finding[,]" *id.*  This same analysis plainly supports this Court's conclusion that the absence of any collection requirement in Section 10(c)'s disclosure provision prevents Plaintiffs from claiming injury as a result of FWS's failure to undertake any such action.

But there is more.  Because the *Friends of Animals II* plaintiffs apparently recognized that the statutory conditions for the required disclosure of information had not come to pass, the complaint that was filed in that case claimed the only transgression that could plausibly be pled under the circumstances: that the agency had missed the 12-month deadline for making the requisite findings.  *See id.* at *4 (noting that the plaintiff had called its case "a deadline suit" and that its "complaint seeks to have the court order compliance with section 4(b)(3)(B)'s deadline requirement, not its disclosure requirement" (internal quotation marks and citation omitted)).  The Circuit emphasized, however, that Congress intended for the deadline duty to be a "distinct" obligation of the agency, *id.* at *3, and thus, the plaintiff would not be permitted to assert that it had suffered an informational injury (i.e., that its right to information had been violated) based on the agency's failure to satisfy the deadline for making findings.  Indeed, according to the Circuit, the fact that the plaintiff's claim necessarily arose under the deadline provision, as opposed to the disclosure provision, only underscored the conclusion that, per the statute, the agency had no obligation to disclose information until such time as findings were made.  *See id.* at *4 ("[Plaintiff's] complaint, in other words, demonstrates precisely why it lacks informational injury: before the [agency] makes a 12-month finding, section 4(b)(3)(B) does not mandate the disclosure of any information whatsoever.").

So it is here.  Plaintiffs' ESA claims challenge FWS's export-permit decision as an arbitrary-and-capricious contravention of Sections 10(a) and 7(a)(2), rather than as a violation of Section 10(c), presumably *precisely because* Section 10(c) does not itself require the agency to collect and disclose the information that Plaintiffs assert that

Section 10(c) requires the agency to collect and disclose for the purpose of their informational-injury argument.  And just as the plaintiff in *Friends of Animals II* earnestly argued that the statutory provisions in that case must be read "[t]ogether" and interpreted to "confer on it the right to timely information" that could be the basis for the plaintiff's claim of informational injury, *id.* at *4 (internal quotation marks and citation omitted), so, too, Plaintiffs here insist that the disclosure mandate in Section 10(c) must be read to include a right (i.e., the right to force the agency to make affirmative efforts to collect certain information and disclose it to the public) that appears nowhere in the statute.  In short, this Court cannot conclude that Plaintiffs have suffered an informational injury under the circumstances presented here consistently with the D.C. Circuit's holding in *Friends of Animals II* because, just as in that case, the statutory provisions at issue here "do[] not [themselves] mandate the disclosure of [the] information" that Plaintiffs say was improperly withheld from them.  *Id.* at *1.[11]

Of course, the absence of any clear statutory requirement that FWS collect the detailed information about the PSN project that Plaintiffs say should have been gathered and disclosed to them pursuant to Section 10(c), raises the question: what is the *real* source of Plaintiffs' insistence that they have met the requirements for having an

---

[11] The D.C. Circuit's holding in *ASPCA v. Feld Entertainment, Inc.*, 659 F.3d 13 (D.C. Cir. 2011), is along these same lines.  There, plaintiffs who asserted that certain elephant-training methods were prohibited by Section 9 alleged they had informational standing because—as they read Section 9—the training methods were prohibited, which meant the defendant circus organization could not "lawfully engage in th[o]se practices without" obtaining a Section 10 permit, which would require it to submit the pertinent information and FWS to make it available under Section 10(c).  *Id.* at 17, 22.  The Circuit disagreed.  "[N]othing in [S]ection 9"—the provision plaintiffs sought to enforce—"even under [plaintiffs'] view, would entitle [them] to any information."  *Id.* at 23.  And because the triggers Congress created for the informational right had not been met (nor was whether they had been the point of contention in the lawsuit), "a suit under [S]ection 10 would [have been] entirely premature."  *Id.* at 24; *see id.* ("Section 10's disclosure requirements are . . . triggered only in the context of an ongoing permit proceeding[.]").

informational injury?  The duty to collect information that Plaintiffs read into the

statute appears to be grounded, first, in their belief the agency could not make a rational

decision about whether the proposed permitting arrangement enhances the survival of

the chimpanzee species (as Section 10(a) requires) without collecting detailed

information about the PSN project (*see* Pls.' Mem. at 46–47), and second, in the fact

that agency *regulations* require applicants for "enhancement" permits to include in the

application certain information about the "[l]ocation where the requested permitted

activity is to occur or be conducted[,]" 50 C.F.R. § 13.12(a)(2), including (1) a

"complete description and address of the institution or other facility where the wildlife

sought to be covered by the permit will be used, displayed, or maintained[,]" *id.*

§ 17.22(a)(1)(v); and (2) the "resume of the experience of those person[s] who will be

caring for the wildlife" covered by the permit, *id.* § 17.22(a)(1)(vi); *see also id.*

§ 17.22(a)(1)(vii) (requiring a "full statement of the reasons why the applicant is

justified in obtaining a permit including the details of the activities sought to be

authorized by the permit").  Plaintiffs argue that they "have a statutory right to

information that they contend the agency *would be required to collect* if Plaintiffs are

correct on the merits of their claims" (Pls.' Corrected Mem. in Opp'n to the Cross-

Mots. For Partial Summ. J. & Reply in Supp. of Pls.' Mot. ("Pls.' Reply"), ECF No. 51-

1, at 38 (emphasis altered)), and insist that FWS's failure to enforce "the agency's own

regulations" (*id.*) by requiring Yerkes to submit substantial information about the PSN

project has injured them (*see id.* at 41 (maintaining that Plaintiffs are "suffering

informational injury because the FWS failed to obtain the information necessary even to

consider granting the permit at issue"); *see also* Pls.' Mem. at 47 (arguing that FWS

"did *not* require Yerkes to submit any information about *where* the PSN program will take place . . . , *who* will conduct that program, any of the qualifications of such individuals, or any of the other details of the program[,]" and that Plaintiffs were harmed by this "failure to obtain that required information and make it available to the public" (emphasis in original))).

This line of argument falls short in several respects.  First of all, Section 10(a) is not the disclosure provision upon which Plaintiffs' informational-injury argument rests, so Plaintiffs' concern that FWS failed to collect information that the agency needed to review in order to make a rational "enhancement" finding has no bearing on Plaintiffs' informational-injury contention.  Second, it is not at all clear that what FWS regulations say about the information that an *applicant must submit* is responsive to the informational-standing question that is at issue here—i.e., whether and under what circumstances the *statute* requires the agency to *disclose* information to the public. Third, and relatedly, the applicable disclosure provision—Section 10(c)—only directs the agency to release information it has "received" in connection with a permit, 16 U.S.C. § 1539(c); it certainly does not purport, either explicitly or implicitly, to entitle anyone to information FWS *might* have received if the agency (1) had understood the permitting regulations differently, or (2) had reached the conclusion that the information an applicant submitted was insufficient under that different view of the regulatory requirements.  In this regard, Plaintiffs appear to have based their informational-injury assertion on a purportedly statute-based "right to information" (Pls.' Reply at 38) that is *much* broader than the right that Congress actually has conveyed in the statute upon which Plaintiffs rely.

Finally, even assuming that the regulations establish and define the scope of FWS's duty to collect information, this Court can find nothing in those regulations that supports a finding that the agency actually breached that collection obligation in the manner Plaintiffs suggest.  That is, the regulations expressly and repeatedly require that an applicant submit various pieces of information about "the wildlife *sought to be covered by the permit*[,]" 50 C.F.R. § 17.22(a)(1) (emphasis added), and other than requiring "[a] full statement of the reasons why the applicant is justified in obtaining the permit[,]" *id*. § 17.22(a)(1)(vii), the regulations do not mandate that the applicant provide specific information pertaining to the manner and extent to which the species will be enhanced if the permit issues.  The fact that the regulations do not refer to or require the submission of information relevant to the agency's enhancement assessment might well support Plaintiffs' merits argument that the Section 10 permitting scheme does not actually authorize an indirect enhancement arrangement such as the one at issue here.  But the lack of any provision of law that requires FWS to collect and distribute the kinds of information that Plaintiffs say they did not receive clearly undermines Plaintiffs' claims of harm for the purpose of the informational-standing analysis.  *See Friends of Animals II*, 2016 WL 3854010, at *4; *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 23–24 (D.C. Cir. 2011).[12]

---

[12] The D.C. Circuit's recent decision in *Friends of Animals I* is not to the contrary.  Plaintiffs there attacked a regulation (and the statute that ordered its promulgation) permitting certain owners of "domestic, captive-bred" endangered antelope to "engage in activities otherwise prohibited by Section 9 of the ESA without applying for individual permits on a case-by-case basis."  824 F.3d at 1036.  The Circuit held that plaintiffs—an animal-welfare advocacy group—had informational standing because Section 10(c) is a disclosure statute, *see id.* at 1041, and because the challenged regulation "eliminate[d] the applicability of individual Section 10 permitting requirements that would otherwise have been necessary to engage in prohibited activities that enhance the propagation or survival of the . . . antelope species."  *Id.*  In other words, the regulation purported to make the congressionally mandated informational triggers inapplicable in a wide swath of cases, and plaintiffs were injured because Section 10(c) would otherwise entitle them to that information.  *See id.* at 1042 (explaining

2.    <u>Plaintiffs' Arguments To The Contrary Proceed From A Mistaken Premise And Thus Are Not Persuasive</u>

Undaunted, Plaintiffs invoke "the well-established rule that to determine standing the Court must accept Plaintiffs' view of the merits."  (Pls.' Reply at 39.) According to Plaintiffs, this means that the Court is required to accept their view that Section 10(c) confers on them a right to certain information that they say FWS had to, yet failed to, collect.  (*See id.* at 38 (maintaining that "this Court is required to assume" that "Plaintiffs have a statutory right to information that they contend the agency *would be required to collect if Plaintiffs are correct on the merits of their claims*" (emphasis in original)); *see also id*. at 42 (expressing the view that Section 10(c)'s "obligation to collect and disclose . . . information applies to the entity that will be conducting the activities that the agency has concluded will 'enhance the survival' of the species, here PSN" and that, "again, the Court must accept this view of the statute when deciding standing").)  But Plaintiffs are wrong to insist that, just because the Court is required to assume the merits of their claims when conducting the informational-standing analysis, it must also accept their *legal* argument that Section 10(c) requires the disclosure of information under the circumstances that Plaintiffs envision, for at least two reasons.

To begin with, it does not help Plaintiffs for this Court to assume that the claims they have brought in this case are meritorious, since the claims these plaintiffs press are wholly independent of the Section 10(c) argument they seek to advance for standing

---

that plaintiffs' claims "directly implicate[d] Section 10's disclosure requirement").  Similar reasoning explains the Circuit's recognition of informational standing in *Public Citizen v. FTC*, 869 F.2d 1541 (D.C. Cir. 1989).  *See id.* at 1542 (allowing plaintiffs to challenge a regulation that purported to exempt "utilitarian objects for personal use" from the strictures of a federal statute that required "producers and distributors of smokeless tobacco products . . . to include health warnings on . . . advertisements" for such products (internal quotation marks and citation omitted)).  Neither of these cases supports finding informational standing where, as here, there is no congressionally mandated right to the information that Plaintiffs say they are entitled to but have not received.

purposes.  *See Friends of Animals II*, 2016 WL 3854010, at *4 (explaining that a plaintiff whose claim of misconduct arises under a statutory provision that does not require the disclosure of information cannot claim that he is injured on the basis of a distinct (albeit related) disclosure provision because "[a] plaintiff can demonstrate informational injury [only] where it seeks to enforce [statutory] disclosure requirements" (citation omitted)); *Feld*, 659 F.3d at 23.[13]  Second, and perhaps even more important, the D.C. Circuit's reasoning in *Friends of Animals II* completely belies any contention that a court's informational-standing analysis is constrained by a plaintiff's assertion that a particular disclosure provision requires the disclosure of information on the terms the plaintiff dictates.  As explained above, the plaintiff in *Friends of Animals II* specifically argued that the deadline and disclosure provisions of Section 4(b)(3)(B) of the ESA must be read together, and so read, must be construed to "confer on it the right to timely information."  *Friends of Animals II*, 2016 WL 3854010, at *4 (internal quotation marks and citation omitted).  Far from adopting this construction of that statute, the Circuit squarely rejected the plaintiff's interpretation, and it found, instead, that "nothing in the Act or its legislative history indicates that the deadline requirement . . . should be read to incorporate the informational purpose of section 4(b)(3)(B)'s disclosure requirement" as a matter of law.  *Id.* at *4.  Notably, nothing about "the well-established rule that . . . the Court must accept Plaintiffs' view of the merits" when determining standing (Pls.' Reply at 39) compelled the *Friends of Animals II* panel to ignore the even more venerable and well-settled principle that it is the role of the court to determine the meaning of a statute, *see id.* at *3–4; *cf. Nixon v.*

---

[13] As explained above, none of Plaintiffs' merits arguments relate to claims that have been brought *under* Section 10(c).  (*See* Pls.' Mem. at 29–45.)

*Sirica*, 487 F.2d 700, 714 (D.C. Cir. 1973) ("[I]t is emphatically the province and duty of the judicial department to say what the law is." (internal quotation marks and footnote omitted)).  And as reflected in Part III.A.1 of the instant Memorandum Opinion, this Court rightly has assumed that same role here.

To be sure, the D.C. Circuit has, at times, asserted that a plaintiff's informational injury is to be evaluated in light of the plaintiff's interpretation of a statute.  *See, e.g.*, *Friends of Animals I*, 824 F.3d at 1040–41 (explaining that "a denial of access to information can work an injury in fact for standing purposes, at least where a statute (*on the claimants' reading*) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them" (emphasis added) (internal quotation marks omitted) (quoting *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002))); *Feld*, 659 F.3d at 23 ("To establish [informational] injury, a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain.").  But this Court takes this directive to mean that, while it is completely within the province of the court to determine whether and under what circumstances a statutory provision requires the disclosure of information, any dispute about whether such circumstances *exist in the case at bar* must be decided in plaintiff's favor for standing purposes.

So, for example, in *FEC v. Akins*, 524 U.S. 11 (1998), the Supreme Court read the statute at issue—the Federal Election Campaign Act of 1971 ("FECA")—as "impos[ing] extensive recordkeeping and disclosure requirements upon groups that fall within the Act's definition of a 'political committee[,]'" *id.* at 14, apparently of its own

volition and without even referring to how the plaintiffs had interpreted the statute.  In fact, what the FECA said about the circumstances under which disclosures must be made was not disputed; the issue that arose was a statute-based question of a different nature: given that only "political committees" were required to make plaintiffs' desired disclosures per the statute, the parties debated whether the American Israel Public Affairs Committee ("AIPAC") qualified as a "political committee" within the meaning of that statute.  *Id.* at 17–18.  It was only when assessing the plaintiffs' argument that AIPAC was a political committee (and thus that plaintiffs had been deprived of the required disclosures) that the Supreme Court concluded that the plaintiffs' injury in fact was "their inability to obtain information—lists of AIPAC donors . . . and campaign-related contributions and expenditures—that, *on* [*plaintiffs'*] *view of the law*, the statute requires that AIPAC makes public."  *Id.* at 21 (emphasis added); *see also Feld*, 659 F.3d at 23 (explaining that, in *Akins*, "plaintiffs' contrary view of the law" consisted of its position "that AIPAC's activities rendered it a 'political committee'" and therefore, "[w]ere plaintiffs to prevail, AIPAC would have to disclose the information [plaintiffs] sought" (citation omitted)).  Thus, for standing purposes, the Supreme Court merely accepted the plaintiffs' assertion that the statute reached AIPAC's conduct, *see Akins*, 524 U.S. at 18, 21, which, in this Court's view, says nothing about whether a court is required to accept a plaintiff's threshold legal argument about whether and to what extent a statute requires disclosure at all.  *Cf. Friends of Animals I*, 824 F.3d at 1041 (finding, based on the Court's own statutory analysis, that Section 10(c) "creates a right to information upon which a claim of informational standing may be predicated").

D.C. Circuit cases that purport to accept the plaintiff's view of the law while analyzing standing can be read this way as well.  *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 583 F.3d 871, 872–73 (D.C. Cir. 2009) (finding "obvious[]" injury in fact to support a claim that the Department of Commerce violated the Federal Advisory Committee Act by failing to make disclosures with respect to advisory committees and assuming for standing purposes that certain organizations in question were *in fact* advisory committees); *see also Feld*, 659 F.3d at 23 (describing the standing analysis in *Judicial Watch* as accepting "plaintiff's view of the law" that those organizations were "'advisory committees' under FACA[,]" thus triggering "'an array of FACA obligations' to disclose information" (internal quotation marks and citation omitted)).  And when *that* meaning of the well-established requirement that the court accept the plaintiff's view of the law with respect to the merits of its claims is applied, it is readily apparent that Plaintiffs' assertion here that this Court must adopt its threshold argument that Section 10(c) is the type of disclosure statute that requires FWS to collect certain information for inclusion in its permit-related files is misguided.

The bottom line is this: just as the D.C. Circuit held that the disclosure provision in *Friends of Animals II* imposed no disclosure obligation on the Secretary until she had made her deadline finding, this Court finds that Section 10(c) imposes no disclosure obligation with respect to any permit-related information beyond the information that FWS receives as part of the application, and this Court need not accept Plaintiffs' assertions that Section 10(c) is actually broader than its plain text provides.  And because Plaintiffs here do not have any right under Section 10(c) to information that FWS did not receive in connection with Yerkes's export-permit application, even

though they have vigorously argued otherwise, Plaintiffs have not suffered a cognizable informational injury.

**B.     NEAVS Does Not Have Organizational Standing**

Plaintiffs' second standing theory rests on NEAVS's contention that FWS's permit decision will injure that organization because it will harm "NEAVS'[s] ability to carry out one of its key missions[.]"  (Pls.' Mem. at 48.)  According to Plaintiffs, NEAVS "is dedicated to ending the use of animals in research, testing[,] and science education[,]" and has been fighting to have captive chimpanzees sent to chimpanzee sanctuaries in the United States for a long time.  (Decl. of Theoroda[sic] Capaldo ("Capaldo Decl."), Ex. 22 to Pls.' Mot., ECF No. 39-24, ¶¶ 1, 3.)  NEAVS's President avers that, "as a direct and immediate result of the unlawfully issued permit" that is being challenged in this case, "NEAVS will be forced to expend more resources attempting to rescue and protect the eight Yerkes chimpanzees that FWS has authorized to be relocated to Wingham[,]" and the increased expenditures allegedly will include the cost of  (1) "monitoring what happens to these chimpanzees and their progeny once the chimpanzees are shipped to England," and (2) "advocat[ing] for the greatest protection possible for these animals under the laws of the United Kingdom[.]"  (*Id.* ¶ 5.)  In this Court's view, recent D.C. Circuit case law confirms that organizational standing requires more than a sincere and strong objection to the challenged government action and a stated intention to use the organization's resources to oppose it, as explained below.  And a review of the record evidence reveals that NEAVS has not demonstrated anything more than that.

1.      An Organization That Sues On Its Own Behalf Must Show That
The Challenged Action Poses An Actual Or Imminent Threat To Its
Ability To Perform Its Activities

Simply stated, an organization is permitted to assert standing on its own behalf,

but only if it can demonstrate that it has an "actual or threatened injury in fact that is

fairly traceable to the alleged illegal action and likely to be redressed by a favorable

court decision." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal

quotation marks and citation omitted); *see also Havens Realty Corp. v. Coleman*, 455

U.S. 363, 378–79 (1982).  The difficulty in applying these core principles—*see PETA*,

797 F.3d at 1099, 1101 (Millet, J., dubitante); *Int'l Acad. of Oral Med. & Toxicology v.*

*FDA*, No. 14-356, 2016 WL 3659887, at *6 (D.D.C. July 1, 2016)—arises from the fact

that, just as individuals need more than a "special interest" in the subject matter of their

lawsuit to have Article III standing, *Lujan*, 504 U.S. at 563 (internal quotation marks

and citation omitted), "an organization's abstract interest in a problem is insufficient to

establish standing, 'no matter how longstanding the interest and no matter how

qualified the organization is in evaluating the problem[,]'"  *Feld*, 659 F.3d at 24

(quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)); *see also id.* at 24–25

(explaining that "'an organization's abstract concern with a subject that could be

affected by an adjudication does not substitute for the concrete injury'" that Article III

demands (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976))).

Therefore, "organizations who seek to do no more than vindicate their own value

preferences through the judicial process generally cannot establish standing."  *Id.*

(internal quotation marks and citation omitted).

Helpfully, the D.C. Circuit has developed standards to assist district courts in

determining when an organization that has an abstract interest in a legal dispute has

also established the concrete injury that is required to establish that it has Article III standing to sue on its own behalf.  The Circuit has adopted a two-part test for organizational standing: courts must "ask, first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *Food & Water Watch*, 808 F.3d at 919 (alteration in original) (quoting *PETA*, 797 F.3d at 1094).

With respect to part one, when the Court undertakes to evaluate the alleged injury to the organization's interest, the organization's activities—and the extent to which the challenged act threatens to damage its ability to conduct those activities—is the key.  *See Abigail All. for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129, 133 (D.C. Cir. 2006) ("The court has distinguished between organizations that allege that their *activities* have been impeded from those that merely allege that their *mission* has been compromised." (emphasis added)); *see also Food & Water Watch*, 808 F.3d at 919 (requiring a "concrete and demonstrable injury to [the organization's] activities" (internal quotation marks omitted) (quoting *PETA*, 797 F.3d at 1093)); *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (explaining that, to show injury in fact, an organization must show "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests.'" (alterations in original) (internal quotation marks and citation omitted)).

Furthermore, to establish that there has been a cognizable injury to its interests (activities), "an organization must allege that the defendant's conduct perceptibly

impaired the organization's ability to provide services[,]" *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (internal quotation marks and citation omitted), and it can demonstrate such impairment by showing, for example, that the "defendant's conduct causes an inhibition of [the organization's] daily operations[,]" *Food & Water Watch*, 808 F.3d at 920 (alteration in original) (internal quotation marks and citation omitted); *see also Chesapeake Climate Action v. Exp.-Imp. Bank*, 78 F. Supp. 3d 208, 234 (D.D.C. 2015) (requiring, at the summary judgment stage, "'specific facts' to show concrete ways in which . . . programmatic activities were harmed" by the challenged action).  That was the case in *PETA v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015), because the group People for the Ethical Treatment of Animals ("PETA") had established that the refusal of the U.S. Department of Agriculture to apply certain statutory animal-welfare requirements to birds (the act that the organization sought to challenge) prevented PETA from "seek[ing] redress for mistreatment of birds through the USDA's complaint procedures" and from gaining "access to bird-related . . . information" that the organization needed in order to educate its members and advocate for the rights of birds.  *Food & Water Watch*, 808 F.3d at 920 (internal quotation marks and citations omitted); *see also PETA*, 797 F.3d at 1091, 1095.   By contrast, in *Food & Water Watch*, 808 F.3d 905 (D.C. Cir. 2015), a food-safety organization complained that the time and resources it had already spent fighting a new poultry-inspection rule would be wasted if the rule took effect, *see Food & Water Watch*, 79 F. Supp. 3d at 200, and also that it would be forced to use some of its education funds to educate its members and warn the public about the rule's negative effects, *id.*, yet the Circuit found that the organization had alleged only an "abstract injury to its interests" that was not enough to

demonstrate impairment of its organizational activities, *Food & Water Watch*, 808 F.3d at 921; *see also id.* at 919 ("An organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).  Additionally, the Circuit emphasized that "an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury[,]" *id.* (citations omitted), because an organization that chooses to spend its money in this way has made a "self-inflicted budgetary choice that cannot qualify as an injury in fact[,]" *Feld*, 659 F.3d at 25 (internal quotation marks and citation omitted).

It is clear from the Circuit's holdings in these and other cases that having a concrete injury to an organization's interests means that the challenged activity must hamper the organization's ability to do what it does, *see Int'l Acad.*, 2016 WL 3659887, at *11, and that complaining that the organization's ultimate goal has been made more difficult is not sufficient, *see Nat'l Ass'n of Home Builders*, 667 F.3d at 11–12.  Nor does it suffice to show that the challenged action runs directly counter to the organization's mission, *see Food & Water Watch*, 808 F.3d. at 921 n.9, or that the organization will have to divert resources to combat it, *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, No. 14-1915, 2016 WL 4435175, at *7 (D.D.C. Aug. 19, 2016) (finding the organization's allegations that the challenged action caused it to redeploy "scarce resources" to be insufficient to establish standing).  This Court has no doubt that the impairment that is required necessitates perceptible strictures on the organization's ability to function, *see, e.g.*, *id.* at *6 ("[O]rganizational plaintiffs [must]

alleg[e] specific facts indicating how a defendant's actions undermine the organization's ability *to perform* its fundamental programmatic services." (emphasis added)); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 24 (D.D.C. 2014) (asking whether the challenged action "impaired [plaintiff's] ability to provide its programs or carry out its activities"), and that NEAVS has failed to demonstrate that it has organizational standing, as explained below.

> 2.   NEAVS's Contention That It Will Have To Spend Money To Thwart The Negative Effects Of The Export Permit Falls Far Short Of Demonstrating That The Permit Has Hampered (Or Will Imminently Hamper) Its Activities Or Operations

Even assuming that NEAVS "has spent many years and resources" fighting for research chimpanzees (including Yerkes-owned chimpanzees) to be retired to chimpanzee sanctuaries (Pls.' Mem. at 48  (quoting Capaldo Decl. ¶ 3) (internal quotation marks omitted)), and even if sending chimpanzees to Wingham directly conflicts with the goals of an organization whose mission centers on "ending the use of animals in research, testing[,] and science education[,]" (Capaldo Decl. ¶ 1), NEAVS has not shown that Yerkes's export permit impairs NEAVS's own activities or operations in any perceptible way.  Indeed, the testimony that Plaintiffs have offered comes nowhere close to specifying how the permit interferes with NEAVS's ability to do its job—e.g., how, due to this particular government action, the organization is prevented from advocating for the transfer of laboratory animals to sanctuaries—and, instead, NEAVS's declarant makes statements that are remarkably close to the kinds of general mission-frustration contentions that the D.C. Circuit has considered (and rejected) as a basis for finding organizational standing.

For example, NEAVS's President says that this export permit "is frustrating the explicit mission" of the organization's flagship campaign (titled "Project R & R (Release and Restitution)") (Capaldo Decl. ¶ 4), and her declaration makes clear that this frustration does *not* stem from the fact that the Yerkes export permit impacts NEAVS's ability to wage that campaign in some way, but from the fact that exporting the Yerkes chimpanzees to a zoo in England is an act that is in ideological opposition to the organization's core belief that "such chimpanzees [should] be retired to chimpanzee sanctuaries in the United States where they can live out the remainder of their lives in settings that mimic their natural habitats to the greatest extent possible[.]"  (*Id.* ¶ 3.) This is no different than Food & Water Watch's argument that the government's new poultry-inspection rules conflicted with its ideological belief that slaughterhouse employees cannot be trusted to inspect poultry carcasses and condemn the tainted ones, *see Food & Water Watch*, 808 F.3d at 920, and upon considering that argument, the D.C. Circuit concluded that such a conflict between the government's action and the organization's mission was "nothing more than an abstract injury" that was insufficient to support organizational standing, *id.* at 921.

NEAVS's related assertions about the expenditure of resources—i.e., that it will be forced to spend (or shift) resources in an attempt to rescue the relocated chimpanzees, monitor their status, advocate for them under any and all applicable laws, and prevent other chimpanzee owners from "rid[ding] themselves of chimpanzees" in a similar fashion (Capaldo Decl. ¶¶ 4–6)—fare no better.  The D.C. Circuit has made clear that such budgetary choices merely reflect shifting priorities regarding "the expenditure of resources on advocacy[,]" *Turlock*, 786 F.3d at 24, and it has long held

that this type of harm amounts to a "self-inflicted" wound, *Feld*, 659 F.3d at 25 (internal quotation marks and citation omitted), that does not qualify as "a cognizable Article III injury[,]" *Turlock*, 786 F.3d at 24 (citation omitted).  NEAVS would have this Court hold otherwise, by pointing to the *PETA* panel's statement that, "if an organization expends resources in response to, and to counteract, the effects of the defendants' alleged [unlawful conduct] rather than in anticipation of litigation, . . .  it has suffered a concrete and demonstrable injury that suffices for purposes of standing." (Pls.' Mem. at 49 (alterations in original) (quoting *PETA*, 797 F.3d at 1097) (internal quotation marks omitted)).  But that statement must be evaluated in the context in which it was made, and PETA's standing was clearly derived not only from the fact that the challenged government actions had actually impaired the organization's ability to perform its services, but also the organization's expenditure of resources as a result. *See PETA*, 797 F.3d at 1095; *see also Food & Water Watch*, 808 F.3d at 920–21 (explaining that, due to the challenged action, PETA had suffered "[t]he denial of access to an avenue for redress and denial of information" in a manner that "perceptibly impaired [the organization's] ability to both bring [statutory] violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public" (second and third alterations in original) (internal quotation marks and citation omitted)).

Plaintiffs' insistence that NEAVS's "core campaign *will* be impaired" due to the Yerkes export permit because the export "will make it *impossible* for NEAVS to advocate for the release of these seven chimpanzees" to a sanctuary (Pls.' Mem. at 49–50 (citing Capaldo Decl. ¶ 4)) (emphasis added), also misses the mark.  As an initial

40

matter, they have offered no proof for that contention because the declaration that

Plaintiffs cite in support of this assertion does not say that.  Furthermore, nothing in the

record demonstrates that it would, in fact, be "impossible" for NEAVS to lobby

Wingham to release these chimpanzees to a sanctuary, much less that the organization's

failure to achieve its mission with respect to these particular animals prevents it from

being able to continue to wage its campaign in the future.  In the absence of such

evidence, the frustration that NEAVS has encountered with respect to its efforts to

advocate for the release of these particular chimpanzees is merely a discrete ideological

setback that cannot be deemed to rise to the level of impairment of its services or daily

operations, as the D.C. Circuit has required.  *See Food & Water Watch*, 808 F.3d at

919; *Int'l Acad.*, 2016 WL 3659887, at *11.  And because Plaintiffs have failed to

establish that the challenged export has injured (or will injure) NEAVS's organizational

interests, Plaintiffs' contention that NEAVS has organizational standing (*see* Pls.'

Mem. at 48–50), fails.

### C.    The Individual Plaintiffs Do Not Have Cognizable Injuries That Have Been Caused By FWS's Permitting Decision

Plaintiffs' final standing argument is that Yerkes's transfer of its chimpanzees to

Wingham will injure three individual plaintiffs, each of whom is a former Yerkes

employee who claims to have formed strong bonds with the particular chimpanzees at

issue here while they cared for them.  (Pls.' Mem. at 50–53; *see also* Decl. of Brian

Hare ("Hare Decl."), Ex. 2 to Pls.' Mot., ECF No. 39-4, 2–11, ¶¶ 5, 7, 9; Decl. of

Jennifer Feuerstein ("Feuerstein Decl."), Ex. 3 to Pls.' Mot., ECF No. 39-5, 2–10, ¶ 3;

Decl. of Rachel Weiss ("Weiss Decl."), Ex. 23 to Pls.' Mot., ECF No. 39-25, 2–6, ¶¶ 5,

10.)[14]  As far as this Court can tell, Plaintiffs have alleged that the export permit they seek to challenge injures the individual plaintiffs in two ways: first, Plaintiffs say, these individuals "have been waiting for years for the day when they would have a chance to be reunited with these animals they love," so "there really can be no question that they will be irrevocably harmed if the FWS allows the chimpanzees Yerkes has already decided to retire to be shipped to Wingham where they will instead be further commercially exploited, rather than to a humane setting somewhere in the United States where these Plaintiffs could visit them."  (Pls.' Reply at 46; *see also, e.g.*, Feuerstein Decl. ¶ 4 ("[I]f the requested export goes forward, I will be unable to observe the chimpanzees because they will be relocated to a foreign, unaccredited zoo far from where I reside.").)  In the following discussion, the Court refers to this alleged harm as the individual plaintiffs' 'dashed-hopes' injury.  (*See infra* Part III.C.1.)  Second, Plaintiffs suggest that the individual plaintiffs will be compelled to visit these chimpanzees if they are sent to Wingham, and if they go there, Plaintiffs will observe these animals in an environment in which the chimpanzees will be "traumatized" (Pls.' Mem. at 51) and "further commercially exploited" (Pls.' Reply at 46), which will allegedly cause these plaintiffs to suffer "personal, aesthetic, and emotional injur[y]"

---

[14] According to their declarations and attached documentation, Hare is an Associate Professor at Duke University who worked at Yerkes for four years—between 1995 and 1999—as a student researcher (Hare Decl. ¶¶ 1–2; Attachment A to Hare Decl., ECF No. 39-4, 12–26, at 14).  Feuerstein, a biologist, was a Yerkes employee from 1997 to 2003 (Feuerstein Decl. ¶¶ 1–2; Attachment A to Feuerstein Decl. at 2, ECF No. 39-5, 11–14, at 13).  Weiss is a former "care technician" who worked for Yerkes for two years in the mid-1990s (Weiss Decl. ¶ 2; Attachment A to Weiss Decl., ECF No. 39-25, 7–10, at 10).  Plaintiffs do not press an argument that the fourth named individual plaintiff (Mary Lee Jensvold) has individual standing, nor do they attempt to assert that plaintiff Georgia the chimpanzee has the capacity to sue in federal court.  Thus, at least as far as their individual-standing contentions go, Plaintiffs have failed to carry their burden with respect to Jensvold and Georgia.  *See, e.g.*, *Int'l Acad.*, 2016 WL 3659887, at *5; *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996).

(*id.* at 44).  (*See, e.g.*, Hare Decl. ¶¶ 21, 25 (claiming he would like to visit the chimpanzees again in a "humane setting" and to view them behaving in ways he believes are natural, and that the export will harm him because, if he visits Wingham afterwards, he "will be injured when Wingham's untrained, inexperienced staff mishandles and mismanages" the chimpanzees, causing the chimpanzees to behave in "unnatural, aberrant" ways); Weiss Decl. ¶ 10 (claiming that if the permit is issued, she "will have to travel to England to see" the chimpanzees and "will only be able to observe [them] acting unnaturally" in an environment of which she disapproves and "will be injured by seeing the physical and psychological manifestations of the stress and trauma experienced by the chimpanzees from living in an unnatural and inhumane environment").)  This injury is "aesthetic" in nature, *see ASPCA v. Ringling Bros. & Barnum & Bailey*, 317 F.3d 334, 337 (D.C. Cir. 2003); *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C. Cir. 1998) (en banc), and the Court has evaluated it as such, *see infra* Part III.C.2.

As explained below, the D.C. Circuit's jurisprudence teaches that not every circumstance that disappoints a plaintiff works a cognizable injury for the purpose of Article III, *see, e.g.*, *In re Navy Chaplaincy*, 534 F.3d at 763; moreover, in the instant case, the dashed-hopes harm these individual plaintiffs allegedly have suffered is also not even fairly traceable to FWS's decision to issue the export permit.  As for Plaintiffs' suggestion that these three individuals will be injured by the permit because, while they "desire to see [the chimpanzees] again in a humane setting where they can enjoy their company" and "observe them engage in normal chimpanzee behavior[,]" they will instead have to see these animals in an environment of "commercial

confinement and exploitation" (Pls.' Reply at 44), the record does not establish that any of these individual plaintiffs will, in fact, travel to see the chimps in the environment they decry, or that, if they do, Wingham necessarily will have mistreated the chimps in such a way that these plaintiffs' aesthetic interests inevitably will be harmed, which means that Plaintiffs have failed to satisfy the standards for proving an imminent aesthetic injury.  Furthermore, and in any event, this Court views any injury to these plaintiff's personal and aesthetic sensibilities from seeing the chimpanzees in the Wingham facility as self-inflicted at its core.

        1.    <u>The Individual Plaintiffs' Dashed-Hopes Harm Is Not An Injury In Fact, And Even If It Qualifies As Such, It Is Yerkes's Placement Decision, Not FWS's Permit, That Caused This Injury</u>

Plaintiffs argue that their dashed-hopes injury is an aesthetic harm that should be found to be sufficient to ground the individual plaintiffs' standing.  (*See* Pls.' Reply at 46 ("[T]hese Plaintiffs who have been waiting for years for the day when they would have a chance to be reunited with these animals they love . . . will be irrevocably harmed if the FWS allows the chimpanzees . . . to be shipped to Wingham . . . , rather than to a humane setting somewhere in the United States[.]" (citations omitted)).)  As an initial matter, it has not been established that the dashing of these individuals' hope that the chimpanzees would be sent to a sanctuary actually qualifies as an "aesthetic" injury, and this Court doubts the applicability of that label under existing law.  To be sure, it is well established that "harm to 'the mere esthetic interests of the plaintiff . . . will suffice' to establish a concrete and particularized injury[,]" *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014) (quoting *Summers*, 555 U.S. at 494), but such interests typically include "the desire to *use or observe* an animal species," *id.* (emphasis added), or the "plaintiff's *enjoyment* of flora or fauna," *Ringling Bros.*, 317 F.3d at 337

(emphasis added), or the "aesthetic interest in *observing* animals living under humane conditions[,]" *Glickman*, 154 F.3d at 431 (emphasis added).  And what Plaintiffs assert with their dashed-hopes contention actually has nothing to do with the impact of the challenged permit on what these individuals are likely to see or feel *when in the company* of the chimpanzees they say they love.  Instead, Plaintiffs insist that what has injured these former Yerkes employees is the mere *knowledge*—presumably acquired while sitting at home—that the animals that they love will be sent somewhere that is not up to these plaintiffs' personal standards.  (*See, e.g.*, Pls.' Reply at 46; Pls.' Mem. at 51; Feuerstein Decl. ¶ 4.)

It is not at all clear that being saddened by the knowledge that an animal you love but with which you have no present contact may be sent to a place in which it will potentially be mistreated (*see* Pls.' Reply at 46)—as opposed to *seeing* such an animal in that condition—qualifies an aesthetic harm.  *See* Oxford English Dictionary 206 (2d ed. 1989) (defining aesthetic in the adjectival sense as meaning "of or relating to sensuous perception" or being "received by the senses"); *see also Ringling Bros.*, 317 F.3d at 337 (finding standing where plaintiff would return to the environment where he would detect the effects of the challenged activity on animals he loved and be injured by such observation); *Glickman*, 154 F.3d at 437 (articulating a "principle of standing" that "recognize[s] individual plaintiffs' injury in fact based on affronts to their aesthetic interests in observing animals living in humane habitats, or in using pristine environmental areas that have not been despoiled").  Presumably, this is what Defendants mean when they emphasize that the individual plaintiffs have not worked with these chimpanzees, or been in their presence, for years, and have no present right

to visit these animals.  (*See* Defs.' Mem. at 24–25.)  That is, far from a baseless attack on the strength of the individual plaintiffs' alleged emotional bond with these animals or a discounting of these plaintiffs' love for them, this line of argument is properly construed as a rebuttal to Plaintiffs' insistence that this Court must find that the individual plaintiffs have suffered a cognizable aesthetic injury because they know "these animals are going somewhere, and depending on where, Plaintiffs will either be able to visit and observe them again or *never* be able to do so" (Pls.' Mem. at 51 (emphasis in original))—an assertion that, in the absence of some sort of tangible experience, is not ordinarily the stuff of which aesthetic injuries are made.

Indeed, Plaintiffs have failed to cite a single case in which a court has held that a similar dashed-hope theory of injury is sufficient to demonstrate that the plaintiff has suffered an injury in fact for the purpose of Article III standing.  This Court suspects that no such case exists, because the dashed-hope harm that Plaintiffs assert actually is functionally indistinguishable from the following generalized grievance that is indisputably insufficient to support standing: that the agency has decided to act in a manner that Plaintiffs dislike under circumstances in which the agency could have opted to do otherwise.  (*See, e.g.*, Pls.' Reply at 46 (asserting that FWS's decision to allow the chimpanzees to be "shipped to Wingham" instead of a U.S. sanctuary will "irrevocably harm[]" these plaintiffs (citation omitted)); *see also id.* (arguing that "if after years of advocating for the release of [an] animal [she loves] from an adverse situation [a] person finally has a chance to be reunited with [it]," but the owner decides not to permit that outcome, "surely she suffers the requisite identifiable trifle required for standing from a decision that will forever foreclose that opportunity" (internal

quotation marks and citation omitted)).)   That is, boiled to bare essence, the gravamen of the individual plaintiffs' dashed-hope injury is that they got their hopes up that a certain result would occur when they heard that Yerkes was retiring these animals (that these chimpanzees would go to a sanctuary), but because of Defendants' actions, that hoped-for outcome will "*never*" happen.  (Pls.' Mem. at 51 (emphasis in original)).   Surely any and every person who feels strongly about a course of action that the government is mulling can make that same assertion—i.e., every concerned outside observer has similar high hopes for the right outcome—yet it is clear from binding case law that more than hurt feelings over a defendant's allegedly wrong (or even illegal) policy choices is required for a plaintiff to have Article III standing to sue.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("By the mere bringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier . . . . [, but] that psychic satisfaction . . . does not redress a cognizable Article III injury." (citation omitted)); *In re Navy Chaplaincy*, 534 F.3d at 763 ("[M]ere personal offense to government action does not give rise to standing to sue." (citation omitted)).   It is clear to this Court that, underneath the creative packaging, the individual plaintiffs' dashed-hopes injury is really nothing more than "an ethical or moral objection" and, thus, "cannot by itself provide a basis for standing."  Sunstein, *supra*, at 1354.[15]

The additional fact that these individual plaintiffs' sanctuary hope was especially well informed and well founded due to their prior personal relationships with the

---

[15] Because the injury is not cognizable, Plaintiffs' vacillation between characterizing it as present or imminent injury is of no moment.  (*Compare* Pls.' Reply at 44 (claiming their "interests *are* greatly impaired by the FWS's decision" (emphasis added)), *with* Pls.' Mem. at 51 (claiming these injuries are "imminent" (internal quotation marks omitted)).)

chimpanzees at issue adds nothing to the standing equation.  To understand why this is so, imagine a former employee of a government agency who hears that his former department is being restructured and has very strong feelings (based on personal knowledge) about how that goal is best accomplished.  In this Court's view, that individual has no more of a personal stake in the outcome of that decisionmaking process than a person who has never worked in the office but would like to apply for a job there and hopes (based on what he reads in the newspaper) that the agency makes the right call.  In other words, no matter how strongly a person feels and how much a person knows about the stakes and the consequences of a decision that he hopes will be made in accordance with his values, that knowledge and affinity alone does not entitle him to claim that the decisionmaker's contrary policy choice has injured him in fact.

Plaintiffs' dashed-hopes theory of injury fails to establish Article III standing on another ground as well: even if the thwarting of one's hope of a different outcome qualifies as a cognizable injury, the hope that was allegedly dashed in the instant case—the hope that the chimpanzees would go to a sanctuary in the United States and not to a zoo overseas—was clearly dashed *by Yerkes* and not by FWS.  As Plaintiffs themselves acknowledge, "Yerkes made clear its decision to relocate these and its other chimpanzees" (Pls.' Mem at 52) "many months ago" (*id.* (citation omitted))—long before FWS took any relevant actions related to these chimpanzees.  The record clearly demonstrates that Yerkes acted on its own to evaluate its options, and that it decided to transfer the animals to Wingham rather than a U.S. sanctuary in 2014, when it signed a contract to that effect.  (*See* Johnson Decl. ¶ 9.).  The Wingham-transfer decision was made by Yerkes before FWS granted the permit, which means that it was *Yerkes'*

*placement determination* that *actually* squelched the individual plaintiffs' hope of reuniting with the chimps at a sanctuary, not FWS's subsequent export authorization. This presents a clear causation problem for the individual plaintiffs, who insist that the decision to transfer these animals to Wingham rather than a sanctuary is what has injured them, because they have not, and cannot, demonstrate that the allegedly injurious transfer decision was made *by FWS*. *See Lujan*, 504 U.S. at 560 (stating the well-established rule that the injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court" (alterations in original) (internal quotation marks and citation omitted)); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Vilsack*, 118 F. Supp. 3d 292, 299, 301 (D.D.C. 2015) (explaining that, when a third party's conduct "is the direct cause of the . . . alleged injury[,]" there are "only two categories of cases" where courts have found standing to challenge government action that regulates that third party's conduct: (1) if the government action authorizes otherwise illegal conduct, or (2) if the record shows "substantial evidence of a causal relationship between the government policy and the third-party conduct" (internal quotation marks and citations omitted)).  What is more, any attempt to solve Plaintiffs' causation problem by modifying the asserted hoped-for outcome—say, by contending that the *real* dashed hope of these plaintiffs was hope that FWS would *intervene* to stop the export plan that Yerkes had already made (*see, e.g.*, Pls.' Reply at 47–48 (arguing that "but for the FWS's decision" to endorse Yerkes' Wingham plan, "Yerkes would be sending these chimpanzees to a U.S. sanctuary"))—leads Plaintiffs right back to the unavailing argument that the individual plaintiffs' dismay over the agency's decision to allow the

export to proceed, which allegedly dashed their hopes of a different outcome, is a cognizable injury in fact for Article III purposes in and of itself.  *See supra* Part III.C.1.

        2.    <u>The Plaintiffs' Alleged Aesthetic Injury Is Too Speculative To Be Imminent, Or Would Be Self-Inflicted</u>

Turning to Plaintiffs' other allegations regarding the alleged aesthetic injury that the Yerkes export permit allegedly has inflicted (or will inflict) on the individual plaintiffs, as explained above, Plaintiffs maintain that the individual plaintiffs have a strong bond with the chimpanzees and that the pending relocation of these animals is an "imminent" injury to them "because Yerkes has clearly decided to relocate these seven chimpanzees—i.e., these animals are going somewhere, and, depending on where, Plaintiffs will either be able to visit and observe them again or *never* be able to do so." (Pls.' Mem. at 51 (emphasis in original) (internal quotation marks omitted).) [16]  If Plaintiffs intend to suggest that the transfer of the Yerkes chimpanzees to a zoo in England will prevent the individual plaintiffs from ever again coming into contact with these animals, that suggestion is puzzling, since no one has provided the Court with any reason to think that the individual plaintiffs will be barred from visiting the chimpanzees at Wingham, and Plaintiffs' briefing and declarations indicate the opposite.  (*See e.g.*, *id.*; Weiss Decl. ¶ 10.)  In any event, it appears that this claim of injury is actually rooted in what Plaintiffs say will likely happen if they *do* visit

---

[16] This Court's analysis addresses only the alleged aesthetic injuries that Plaintiffs have proffered in their motion for summary judgment as a basis for standing and that appear to be within the scope of the complaint's allegations of fact.  The additional claims that some of the declarants make— e.g., Hare's claims that the export will hurt him because he knows that, if Wingham breeds the chimpanzees, the babies "will add to the already burgeoning *surplus* of chimpanzees in Europe that need homes," and that, if Wingham places any of the babies in its hands-on programs for children it would "foster the highly detrimental pet and entertainment trade in chimpanzee s[.]"  (Hare Decl. ¶¶ 27– 28 (emphasis in original); *see also id.* ¶ 24 (Hare claiming that he will be harmed if "some but not all of the chimpanzees are sent to Wingham"))—have not been adopted by Plaintiffs in support of their standing arguments, and thus, this Court has not considered them.

Wingham and see these chimpanzees again: that they will inevitably view the chimpanzees they love "in harmful conditions" and as a result will suffer "aesthetic and emotional distress[.]"  (Compl. ¶ 22; *id.* ¶ 25; *see also* Hare Decl. ¶¶ 21, 25 (claiming he would like to visit the chimpanzees again in a "humane setting" and "will be injured when [he sees] Wingham's untrained, inexperienced staff mishandl[ing] and mismanag[ing]" the animals, causing them to behave in "unnatural, aberrant" ways); Weiss Decl. ¶ 10 (claiming that if the permit is issued she "will have to travel to England to see" the chimpanzees and "will only be able to observe [them] acting unnaturally" in an environment of which she disapproves, and "will be injured by seeing the physical and psychological manifestations of the stress and trauma experienced by the chimpanzees from living in an unnatural and inhumane environment").)

In this Court's view, these claims of aesthetic injury fail for at least two reasons. First of all, they seem to be entirely speculative; on the instant record, there is no evidence that any of these individual plaintiffs actually have plans to go to Wingham to see these animals.  One plaintiff (Feuerstein) never even suggests that she might visit the chimpanzees if they are exported.  (*See generally* Feuerstein Decl.)  Hare says only that "[i]f" he visits Wingham, harm will occur (Hare Decl. ¶ 25), which is just to say that his visit is "possible[,]" and such a representation is not only insufficient for imminence, *Clapper*, 133 S. Ct. at 1147 (emphasis omitted) (internal quotation marks and citation omitted), it does not come close to the kinds of representations that other successful aesthetic-injury plaintiffs have made, *see, e.g.*, *Ringling Bros.*, 317 F.3d at 337–38 (plaintiff who had bonded with particular elephants was permitted to proceed

beyond the motion-to-dismiss stage largely because he averred that he *would* actually

visit the circus and see elephants exhibiting signs of mistreatment due to the abusive

practices).  Weiss goes the farthest, claiming that, if the export goes forward, she "will

*have to* travel to England" to see the chimpanzees.  (Weiss Decl. ¶ 10 (emphasis

added).)  But she offers nothing beyond say-so on that front; she does not contend, for

example, that she has already purchased tickets to Wingham or has concrete plans to do

so soon after the chimpanzees are exported.  And at this stage of the litigation, in the

absence of any such evidence, she articulates precisely the sort of "'some day'

intention[]—without any description of concrete plans, or indeed even any specification

of when the some day will be"—that the Supreme Court has rejected as insufficient to

establish imminent injury.  *Lujan*, 504 U.S. at 564 (emphasis omitted) (citation

omitted); *see also Summers*, 555 U.S. at 496 (finding at the summary judgment stage

that a plaintiff's "vague desire to return" to forest areas he wished to protect was not

sufficient to demonstrate standing).

Compounding Plaintiffs' imminence problem is the fact that the record lacks

sufficient evidence to support their contention that Wingham's caregivers will

inevitably house the chimpanzees in "inhumane" conditions and will mistreat the

animals to such a degree that these individual plaintiffs will see this if they travel there

and be personally affected.  In the *Ringling Brothers* case, the plaintiff was a former

employee of the defendant circus organization who was suing to enjoin the

organization's use of certain elephant-training methods he disliked; importantly, he had

actually *witnessed* the abusive treatment of the animals that he said he would like to see

again (and had been, he said, aesthetically injured by the animals' reactions to said

treatment), which supported the inference that the abusive practices the plaintiff challenged had unquestionably occurred and were likely to continue.  *See* 317 F.3d at 335.  Under those circumstances, and given the fact that the case was at the motion-to-dismiss stage, the D.C. Circuit appeared to assume (without expressly holding) that the alleged aesthetic injury to the plaintiff was not speculative.  *See id.* at 337 (noting that plaintiff's claim that he would "like to 'visit' [the animals] again" to rekindle his relationship was somewhat vague, but that "a fair construction of his allegation encompass[ed his] attending the circus as any member of the public would," from which "vantage point he might observe" the effects of mistreatment, which he "claim[ed] he would recognize based on his experience working at [the circus]").  Here, by contrast, we are at the summary judgment stage, yet Plaintiffs have not shown that mistreatment of the Yerkes chimpanzees is inevitable or even highly likely when they are transferred into Wingham's custody and, indeed, other than making sweeping assertions about the extent to which these chimpanzees will be put in danger (which Yerkes strenuously denies (*see* Yerkes's Mot. at 15–17)), Plaintiffs provide few specifics about the particular acts of abuse that they claim they will witness to their detriment.

   To be sure, Plaintiffs *say* that the chimpanzees will not be safe in the hands of Wingham's staff; their briefs and declarations describe Wingham's employees as abusive neophytes who are intent upon displaying the animals in a harmful commercial environment and breeding them in perpetuity.  (*See, e.g.*, Hare Decl. ¶¶ 21, 25.)  But this Court need not accept these bald representations.[17]  And the record is devoid of

---

[17] At this stage "a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts."  *Fed. Forest Res. Coal.*, 100 F. Supp. 3d at 34 (quoting *Clapper*, 133 S. Ct. at 1148–49); *see also Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009) ("The object of [Rule 56(e)'s 'specific facts' requirement] is not to replace

actual evidence that would support an inference that these animals will likely be mistreated, which Plaintiffs need if the individual plaintiffs' assertions that they *will* see the chimpanzees in inhumane conditions if they travel to Wingham are going to constitute a sufficiently imminent injury for Article III purposes. *See Clapper*, 133 S. Ct. at 1147 (holding that an imminent injury must be "certainly impending" to serve as an injury in fact (internal quotation marks and citation omitted)).  Thus, just as in other cases in which courts have rejected "multi-tiered speculation" from plaintiffs who were claiming imminent injury, *GrassRoots Recycling Network, Inc. v. EPA*, 429 F.3d 1109, 1112 (D.C. Cir. 2005) (internal quotation marks and citations omitted), and have frowned on "standing theories that rest on speculation about the decisions of independent actors[,]" *Clapper*, 133 S. Ct. at 1150 (citation omitted); *see also Lujan*, 504 U.S. at 562; *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016), this Court, too, must conclude that the individual plaintiffs' alleged aesthetic harm is not "certainly impending[,]" *Clapper*, 133 S. Ct. at 1147 (internal quotation marks and citation omitted).

Finally, it also clear to this Court that, unless these individual plaintiffs can somehow make a persuasive claim that a trip to England to see these chimpanzees is *inevitable*, it will be difficult for them to establish that the resulting injury to their aesthetic sensibilities is not a self-inflicted wound.  Put another way, this Court finds it

---

conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." (alteration in original) (internal quotation marks omitted) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)); *Feld*, 659 F.3d at 27 (rejecting as insufficient at the summary judgment stage the plaintiff's claims that causation could be demonstrated by "logic" where plaintiff failed to offer "specific facts" supporting that "logic").  Furthermore, accepting the merits of the APA-related claims that have been brought in this case does not require blindly assuming that the exported chimpanzees will, in fact, be subject to abuse.

hard to believe that a plaintiff whose presence at the place that he says will injure him aesthetically is not *compelled* (e.g., someone who does not live or work in the vicinity, nor has any history of traveling there, and is not otherwise required to be there) can complain that he will be injured by what he sees if he makes the trip, because it is well established that an injury one brings upon oneself is not a cognizable injury that has been caused by the defendant's conduct. *See Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (explaining that self-inflicted harm can neither be deemed "an injury cognizable under Article III" nor "fairly traceable to the defendant's challenged conduct" and denying standing to an "association [that had] *chosen* to remain in the lurch" (emphasis in original) (internal quotation marks and citations omitted)).

In sum, this Court concludes that Plaintiffs' dashed-hopes theory is not a cognizable injury in fact, the individual plaintiffs' alleged aesthetic injury has not been shown to be sufficiently imminent, and that, in any event, neither of these harms is fairly traceable to the permitting decision the individual plaintiffs seek to challenge. Thus, Plaintiffs have offered no persuasive reason that the individual plaintiffs have standing to attack the Yerkes export permit in federal court.

### D.   This Court Cannot Reach The Merits Of Plaintiffs' Claims[18]

Having determined that no plaintiff has Article III standing because none has

---

[18] Plaintiffs have asserted the same informational, organizational, and aesthetic injuries with respect to all of their challenges to the export permit; therefore, the insufficiency of these injury contentions marks the end of their ability to press any of these claims in this Court.  That said, in a footnote at the conclusion of their opening brief, Plaintiffs have also made cryptic statements regarding "procedural" standing.  (*See* Pls.' Mem. at 53 n.43 ("Because they all have an independent substantive basis for standing, NEAVS and the individual Plaintiffs also have standing to bring their NEPA and [ESA] Section 7 claims, without having to show that if the agency had complied with those statutory requirements it would not have allowed the export to proceed." (emphasis omitted) (citing *Lujan*, 504 U.S. at 572 n.7)).)  Plaintiffs appear to be seeking to invoke the rule that courts "relax the normal

suffered a cognizable injury in fact under any of the theories Plaintiffs have proposed,

this Court cannot reach the merits of the instant complaint's non-FOIA-related counts.

It is lamentable that Plaintiffs' concerns about this particular export permit, and the

way in which FWS appears to have interpreted the ESA to authorize it, cannot be vetted

by a federal court at this time—or likely *ever*, given Yerkes's representation that it

plans to "complete the export before the November 1, 2016 permit expiration date if the

permit is affirmed" (Notice, ECF No. 55, at 1))—because, on the merits, Plaintiffs' case

raises significant legal issues regarding whether or not the ESA actually authorizes

FWS to permit the exportation of endangered species whenever the agency can

somehow conceive of a way in which the act of granting the permit (as opposed to

allowing the permitted activity) benefits the species of animal that is being exported.

Among the many important questions that a court considering the merits of

Plaintiffs' APA claims would face is whether the deference to an agency's statutory

interpretation that the Supreme Court established in *Chevron, U.S.A., Inc. v. Natural

Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is even applicable to the

informal adjudication that resulted in FWS's enhancement finding.  *See Barnhart v.

Walton*, 535 U.S. 212, 222 (2002); *United States v. Mead Corp.*, 533 U.S. 218, 230–31

(2001).  And even if it is, the *Chevron* test requires a court to determine whether the

---

standards of redressability and imminence[,]" *Sierra Club v. FERC*, No. 14-1249, 2016 WL 3525562, at
*3 (D.C. Cir. June 28, 2016) (citation omitted), when a plaintiff alleges an impingement on its
procedural interests, but they make no other mention of "procedural" standing, and this Court declines
to address the argument because "perfunctory and undeveloped arguments . . . are deemed waived[,]"
*XP Vehicles*, 156 F. Supp. 3d at 192 n.2 (alteration in original) (internal quotation marks and citation
omitted).  In any event, the relaxed redressability requirement has no relevance to this Court's
conclusion that no plaintiff has a cognizable injury in fact, and none of the allegedly imminent injuries
would be aided by any permissible relaxation of that standard.

statute that the agency has interpreted to authorize its actions really does so, *see Vill. Of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011), which appears to be a heavy lift for FWS in this case, at least as far as it has determined that the ESA allows the agency to find Section 10's "enhancement" requirements satisfied upon nothing more than the permittee's promise to donate money to an unrelated conservation effort.   The plain language of Section 10(a) does not say this, and FWS's broad interpretation appears to thwart the dynamic of environmental protection that Congress plainly intended when it mandated that *no* export of endangered species be allowed, *see* 16 U.S.C. § 1538, unless the agency permits such export *pursuant to certain specified circumstances*, *see id.* § 1539(a).   FWS essentially urges the Court to read those circumstances out of the statute, such that Section 10(a)'s enhancement-finding requirement actually places no meaningful constraints on FWS's ability to authorize prohibited activities, because, as a practical matter, the agency can *always* condition the granting of a permit on the permittee's undertaking some *other* act that advances scientific knowledge or benefits the species, regardless of the intentions of the permittee with respect to the particular animals it seeks to access and/or the permittee's avowed lack of interest in furthering the species as a whole.[19]

This is all to say that the significant degree of fervor that has accompanied Plaintiffs' written and oral arguments in this case is entirely understandable, and that

---

[19] This Court sought to explore the limits (if any) of FWS's interpretation of Section 10(a) during the oral argument that it held on Plaintiffs' motion for a preliminary injunction.  The Court asked, for example, whether, "[a]s long as Michael Jackson gives . . . $45,000" to some third party to be used ostensibly to enhance the propagation of the species, FWS could grant him (or some other rich dilettante) an export permit.  (Tr. of P.I. Hr'g, ECF No. 29, at 100:1–4.)  In response, counsel for FWS admitted that the agency's view of the statute would allow for such a grant.  (*Id.* at 100:5–12, 24–25, 101:1–9.)  What remained unclear—and what a court considering the merits of Plaintiffs' claims would have to determine—is whether authorizing FWS to barter export permits in this fashion was truly what Congress intended Section 10(a) to authorize.

Plaintiffs have ably made the persuasive argument that, far from viewing Section 10(a) as a *limit* on the circumstances in which the permitting of activities that impact endangered species can occur, FWS now apparently views that provision as a green light to launch a permit-exchange program wherein the agency brokers deals between, on the one hand, anyone who wishes to access endangered species in a manner prohibited by the ESA and has sufficient funds to finance that desire, and on the other, the agency's own favored, species-related recipients of funds and other services.  This Court considers doubtful FWS's insistence that, when Congress penned Section 10(a) it intended to authorize the agency to 'sell' its permits in this fashion so long as the affected species might (as a whole) be conceived of as benefitting from the exchange. But the Court cannot evaluate and rule upon the merits of Plaintiffs' contentions, or FWS's responses, because the constraints of Article III standing prevent it from reaching the merits of the important questions of statutory interpretation and administrative law that have been presented in this case, as explained above.

## IV.    CONCLUSION

To avoid "stepp[ing] where the Constitution forb[ids] it to tread[,]" *Hancock v. Urban Outfitters, Inc.*, No. 14-7047, 2016 WL 3996710, at *2 (D.C. Cir. July 26, 2016), a federal court must evaluate standing to sue before delving into the merits of a case— even when the case involves troubling claims of potential harm to protected animal species.  This Court's examination of the alleged (human and organizational) injuries that Plaintiffs here say FWS's decision to issue an export permit to Yerkes purportedly has caused leads it to the conclusion that none of the Plaintiffs has a cognizable injury in fact, and thus, this Court does not have subject-matter jurisdiction to address

Plaintiffs' claims or to order the relief that Plaintiffs seek.  *See Scenic Am.*, 2016 WL 4608153, at *4 (explaining that, at summary judgment, if "the plaintiff has not introduced sufficient evidence into the record to at least raise a disputed issue of fact as to each element of standing, the court has no power to proceed and must dismiss the case" (citation omitted)).  Notably, this Court's determination rests solely on its understanding of what binding legal precedents dictate regarding the requirements of Article III standing; it is clear beyond cavil that "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy[,]" *Valley Forge*, 454 U.S. at 486, nor is it measured by the importance of the issues presented or the potential that the plaintiff might prevail on the merits of his claims, if the Court had the power to reach them.

Accordingly, as set forth in the order accompanying this opinion, Plaintiffs' partial motion for summary judgment is **DENIED**, and Defendants' and Yerkes's partial motions for summary judgment are **GRANTED**.  Plaintiffs' FOIA claim (Count V of the complaint) persists, but all of Plaintiffs' other claims (Counts I–IV) must be dismissed.

DATE:  September 14, 2016

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge